UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACKILYN BUNNELL,
     Plaintiff,
     v.

WILLIAM BEAUMONT
HOSPITAL,
     Defendant.
_____/

Case No. 22-12414

Brandy R. McMillion
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 20)

## I.  BACKGROUND

Plaintiff Jackilyn Bunnell filed this employment discrimination suit on October 10, 2022 and amended her complaint on February 21, 2023.  (ECF Nos. 1, 13).  Defendant William Beaumont Hospital ("Beaumont") filed a motion for summary judgment on October 10, 2023.  (ECF Nos. 4, 14, 20).  The motion is fully briefed.  (ECF Nos. 23, 24).  She brings claims of sex and pregnancy discrimination, disability discrimination, failure to accommodate, retaliation, and intentional infliction of emotional distress.

This case was referred to the undersigned for all pretrial matters.  (ECF No. 26).

For the reasons discussed below, the undersigned recommends that

Defendant's motion for summary judgment be **GRANTED** and that the case be

dismissed.

## II.   FACTS

Plaintiff was a cardiac ultrasonographer at Beaumont in its Royal Oak

division.  (ECF No. 20-27, PageID.443-448).  She worked primarily in the

cardiology non-invasive department, but often worked shifts in the Women's Heart

Center, as did other employees.  (ECF No. 20-27, PageID.445-447).  Plaintiff's

supervisor, Tracy Zeiter, was managed by Lauren Burgett, the manager of the

Electrophysiology department.  (ECF No. 20-28, PageID.754, 825).

Around December 2, 2019, Plaintiff informed Zeiter that she was pregnant

and requested an accommodation to avoid radiation exposure.  (ECF No. 20-27,

PageID.480).  Zeiter congratulated her on her pregnancy (ECF No. 20-27,

PageID.483-485) and told her the accommodation "is not a problem," and had

Plaintiff removed from any shifts where she would be exposed to radiation.  (ECF

No. 20-29, PageID.1048-1049).  Zeiter also told her no formalities or doctor's

notes were required for now.  (ECF No. 20-27, PageID.483-493).

Beaumont's health counseling and pregnancy policy said "[p]regnant

employees may seek advice from Occupational Health Service . . . about the risk of

transmission of infectious disease," and discuss with HR as needed.  (*Id.* at

PageID.273).  Beaumont sought to "protect the pregnant woman," (ECF No. 20-28, PageID.824) but noted that "[p]regnant employees should not be routinely excluded from the care of patients with infections."  (ECF No. 20-27, PageID.273, 538).  According to the policy, pregnant women need be restricted only from Parvovirus B19 and, if the employee is not vaccinated or immunized to the virus, for Rubeola, Rubella, Tuberculosis, and Varicella.  (ECF No. 20-7, PageID.273-275).  For influenza, pregnant employees were recommended a yearly vaccine. (*Id.*).

On February 26, 2020, Plaintiff approached Zeiter with two doctor's notes, one of which mentioned she was experiencing morning sickness and the other stated she should "avoid x-ray exposure" and "infectious disease[s]."  (*Id.* at PageID.452-97).  Zeiter "was very upset" (*Id.*) and told Plaintiff she was a disappointment and was "putting a strain on their department."  (ECF No. 20-29, PageID.1053).  Zeiter told Plaintiff she was receiving some pushback on the accommodation and employees were complaining about their workload. (ECF No. 20-27, PageID.494-496).

Later, Zeiter apologized and said she reacted in that way because she was stressed by other employees as Julie Murray, Plaintiff's program assistant, had told Zeiter that Plaintiff's duties were "falling on other team members" (ECF No. 20-29, PageID.1054-55) and other members were "getting a little frustrated."  (ECF

No. 20-27, PageID.533-535).  On March 16, Zeiter sent Plaintiff a text saying "don't misinterpret my comment about you . . . I did not at all intend it to sound as if it was a hinder on the lab." (ECF No. 20-29, PageID.305).  As of this date, Plaintiff was not required to enter rooms that contained patients with infectious diseases.  (*Id.* at 549).

In March 2020, another ultrasonographer, Deni Johnson, announced her pregnancy.  (ECF No. 20-27, PageID.512).  The Covid-19 pandemic began about one week later, on March 23, 2020.  (*Id.* at PageID.571).  There was confusion about how to handle Covid-19, as it "was very unknown" (ECF No. 20-29, PageID.1075) and the hospital "closed down everything that [it] could" in an attempt to keep all . . . staff outside of COVID rooms." (ECF No. 20-28, PageID.824, 828, 870).  Despite these efforts, "it became . . . difficult . . . to accommodate" employees because "the number of patients . . . that did not have COVID were very, very limited." (*Id.* at PageID.829, 871).  As the hospital attempted to accommodate "all employees" it told them they could "take a PTO and stay home," or "go into the Labor Pool and continue to get paid" and worked with employees to get them "into [the] right places based upon what they were comfortable with." (*Id.* at PageID.830-831).  The Labor Pool coordinated roles for employees across the hospital.  (*Id.* at PageID.831-832).  All employees were told

if they "do not feel safe in the assignment that [they] are given" Zeiter would work with them.  (ECF No. 20-29, PageID.1115).

Zeiter contacted both Plaintiff and Johnson and told them they should avoid portable shifts, where employees had to go "out into the hospital to different floors" and generally avoid walking around the hospital.  (ECF No. 20-27, PageID.549).  Bunnell was "immediately told that she would not be performing echo on any COVID patients" (ECF No. 20-29, PageID.1076) and that Zeiter "would like to meet and discuss some safer options" for Johnson and Plaintiff. (ECF No. 20-27, PageID.561-564).  Zeiter told Plaintiff she was "doing everything . . . to put her in the safest possible place and if she felt it wasn't safe, she was instructed to bring that" to Zeiter's attention.  (ECF No. 20-29, PageID.1100-1101).  Plaintiff also was aware of her option to go on unpaid leave or unpaid status if she was not comfortable working in the labor pool.  (*Id.* at PageID.585).

Zeiter rotated her employees "evenly" in the labor pool.  (ECF No. 20-29, PageID.1092).  Zeiter offered Plaintiff multiple shifts, which she declined.  (ECF No. 20-27, PageID.577), (ECF No. 20-29, PageID.1088-1089).  On March 30, Zeiter offered Plaintiff an assignment to distribute scrubs, which Plaintiff accepted. (ECF No. 20-27, PageID.578-579).  Plaintiff was then assigned a shift cleaning Covid floors, which she declined.  (*Id.* at PageID.580).  On another shift, Plaintiff was screening employees or visitors to make sure they did not have Covid

symptoms.  (*Id.* at PageID.581-582).  In this shift, she always had a surgical mask

on, but was within six feet of people who were Covid positive, potentially for more

than ten minutes.  (*Id.*).  In any other shift she was in the labor pool, she was also

wearing a surgical mask.  (*Id.* at PageID.583).

Zeiter told Plaintiff that hospital policy defined "exposure" as being within

six feet of an infected individual for ten minutes or longer, without a face mask.

(*Id.* at PageID.319).  On the days Plaintiff complained of being exposed, she was

equipped with a face mask.  (ECF No. 20-17, PageID.582).  Though she was

within six feet of people who may have had Covid, because she was in a mask, she

was not officially "exposed" in accordance with Defendant's policy.

There were also "hundreds" of layoffs then.  (ECF No. 20-28, PageID.864).

Burgett told Zeiter four people needed to be laid off in her department because

"there were not enough hours" for the department.  (*Id.* at PageID.PageID.854).

They agreed to make this decision based on how many hours "[were] currently

needed to run the department," (*Id.* at PageID.857), including "productivity,

overall volumes, portable volumes, [and] seniority" in 2019.  (ECF No. 20-29,

PageID.1138-1140).  In particular, Zeiter considered her employees' "portable

volume" which "give a . . . true assessment to their efficiency because when you're

portable you have less barriers in your way."  (ECF No. 20-29, PageID.1140).  All

sonographers rotated in different departments, and it was typical for every

employee to work one day a week in an outpatient setting, and so portables were considered instead.  (ECF No. 20-29, PageID.1169-1170).  Zeiter, Burgett, and Julie Huber discussed who would be laid off.  (ECF No. 20-28, PageID.858, 879).  Later, in speaking with a Human Resources ("HR") representative, Plaintiff was told layoffs are typically performed based on seniority, though they are ultimately "up to the leadership in the department" and HR was unaware of what specifically happened in Plaintiff's situation.  (*Id.* at PageID.626-30).

   Though Plaintiff had good reviews and never had any complaints, she "carried the lowest volume over the course of the year" and was on the bottom of the list.  (ECF No. 20-29, PageID.1174-1175, 1228).

Plaintiff was surprised at her layoff because she never had a private meeting with Zeiter about improving her productivity, was never told she had low productivity, and because she did most of her hours in the Women's Heart Center, which was not considered in the productivity analysis.  (ECF No. 20-27, PageID.632-633).  She was also pregnant as of November 30, 2019, and her morning sickness forced her to leave often to throw up.  (*Id.* at PageID.635).

On April 20, Zeiter emailed her employees asking for each of their mailing addresses so she could send them "healthcare hero" signs.  (*Id.* at PageID.615).  The next day, on April 21, Plaintiff was temporarily laid off, and no longer had access to her email, and therefore did not reply or receive a sign with everyone

else.  (*Id.* at PageID.615-616).  After reaching out a second time, Zeiter delivered

the sign to Plaintiff.  (*Id.*).  Plaintiff was on temporary leave status from April 21 to

July 30, 2020.  (*Id.* at PageID.673).

While on layoff, her benefits were intact.  (*Id.* at PageID.658).  Onalee

Watson, an HR representative told Plaintiff they could process a leave of absence

or FMLA leave with short term disability for her.  (*Id.* at PageID.654), (ECF No.

20-31, PageID.1568).  Plaintiff did not want to use her FMLA leave at this time

because she "didn't want to waste it," and chose instead to stay on unemployment.

(ECF No. 20-27, PageID.661), (ECF No. 20-31, PageID.1566).

Plaintiff's baby was born two months premature, at which point she

contacted Watson.  (*Id.*).  Watson told her she could receive short term disability

payments if she took a leave of absence.  (*Id.* at PageID.652-54).  She was told by

Kevin Brancaleone, an HR employment representative, that her FMLA leave was

approved and that she could be eligible for additional medical leave beyond that.

(ECF No. 20-27, PageID.660), (ECF No. 20-30, PageID.1300-1301).  She was also

informed about FMLA leave.  (*Id.* at PageID.660).  By August 18, Watson

backdated Plaintiff's FMLA, and she was approved for FMLA leave.  (ECF No.

20-31, PageID.1624).  Plaintiff informed Zeiter she would be cleared on October

21, 2020.  (*Id.* at PageID.674-677).

Around July or August 2020, Beaumont was attempting to recall temporarily laid off employees, and Zeiter and Burgett called Plaintiff to notify her of this policy. (ECF No. 20-27, PageID.664). Plaintiff told them she wasn't medically cleared. (*Id.*).

During this time, Deni Johnson, who was laid off with Plaintiff, was recalled to work because she had a specialized certification her department needed. (ECF No. 20-28, PageID.849-850). No other employees were brought back from layoff. (*Id.*).

On October 16, 2020, Plaintiff sent a note to Zeiter informing her she would be cleared to return to work by October 21. (ECF No. 20-27, PageID.677). Zeiter responded and told her "we continue to evaluate the volume and staffing needs on a weekly basis" and told her she could "apply for other positions in the system." (*Id.*). Plaintiff did not apply to any because she "wanted to return to Royal Oak," it "was the specialty hospital for [her] job," and she "liked [her] job . . . and [her] coworkers . . . so [she] wanted to return back." (*Id.* at PageID.681-682). On October 21, Plaintiff was placed back on layoff status. (*Id.*).

On October 21, 2020 at 7:40 AM, Zeiter received an email from the "lead echo person" on the Dearborn campus about a "full-time day shift." (ECF No. 20-28, PageID.1027). The email specifically asked about "someone" who was "interested in" a "full-time day shift." (*Id.* at PageID.1028). Zeiter responded,

saying Plaintiff "was furloughed and went from layoff to Medical Leave as she had a baby in the middle of her layoff status." (*Id.*).  At 1:30 pm, Zeiter told Plaintiff "the volume was inconsistent," so Plaintiff's department "could not get approval to return a full-time" employee. (*Id.* at PageID.1022-26).  Zeiter notified Plaintiff they were "unable to return [her] to work" and she would "be placed on layoff status," but did not tell Plaintiff about the Dearborn position. (*Id.*).  This was because she thought Plaintiff "did not apply to that position nor indicate that she wanted the job," but Plaintiff had the chance to apply "multiple times" because the position was posted.  (ECF No. 20-29, PageID.1283).  Beaumont also did not "have any oversight at the Dearborn location" and only knew "how the department functions . . . at Royal Oak."  (ECF No. 20-28, PageID.836).  Each site had their own labor pool.  (*Id.* at PageID.842).

Zeiter determined she did not have the volume to support a full-time employee.  (ECF No. 20-29, PageID.1271).  Through December 2020 and January 2021, Plaintiff was informed she should work with Talent Acquisition to obtain an open position.  (ECF No. 20-27, PageID.at 678-700).  Plaintiff never applied for any contingent position in her department, though Talent Acquisition informed her of two ultrasonographer positions, though they were part-time positions.  (*Id.*).  She said she was "trying to find something similar to the job that [she] did before."  (*Id.* at PageID.704).

Beaumont began a "phase two" policy in which employees were told if they did not find a position by February 5, 2021, they would be granted severance and considered resigned. (ECF No. 20-29, PageID.1270-1273). Zeiter, Burgett, and Brancaleone informed Plaintiff if she didn't have a job by February 5, 2021, she would not be employed anymore and could receive severance. (ECF No. 20-27, PageID.706). Plaintiff declined a few positions and was unemployed on February 5, 2021. (*Id.*). She was then terminated. (*Id.*).

Plaintiff then filed this action, bringing claims of sex discrimination in violation of Title VII and the Elliott-Larson Civil Rights Act ("ELCRA"); Retaliation under Title VII, ELCRA, the Americans with Disabilities Act ("ADA"), and Family Medical Leave Act ("FMLA"); Failure to Accommodate in violation of ADA; discrimination under Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"); interference under FMLA; and Intentional Infliction of Emotional Distress ("IIED").

## III.   ANALYSIS AND RECOMMENDATIONS

### A.   Governing Standards

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome under governing law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citation omitted).  In other words,

12

summary judgment is appropriate when "a motion for summary judgment is
properly made and supported and the nonmoving party fails to respond with a
showing sufficient to establish an essential element of its case. . . ." *Stansberry*,
651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

    B.   <u>Discussion</u>

       i.   Sex/Pregnancy Discrimination Under Title VII and ELCRA

Plaintiff brings claims of sex and pregnancy discrimination in violation of
Title VII and ELCRA. She claims she was exposed to a discriminatory work
environment, was orally berated by her supervisors, her hours were cut, and only
pregnant employees in her department were laid off. (ECF No. 13, PageID.110).
Though Zeiter claims the layoffs were decided based on productivity data, Plaintiff
claims her supervisor deliberately chose to lay her off for biases. (ECF No. 13,
PageID.110). These biases were again evident when Zeiter did not deliver a
"healthcare heroes" sign to Plaintiff's home. (ECF No. 13, PageID.110).

Title VII provides that "[i]t shall be an unlawful employment practice for an
employer . . . to discriminate against any individual with respect to h[er]
compensation, terms, conditions, or privileges of employment, because of such
individual's . . . sex." *Piank v. General R.V. Ctr., Inc.*, 2023 WL 3938852 (June 9,
2023) (citing 42 U.S.C. § 2000e-2). Sex includes, but is not limited to, pregnancy,
childbirth, or a medical condition related to pregnancy and childbirth. 42 U.S.C. §

2000e(k).  To establish a prima facie case of sex discrimination under Title VII, a

plaintiff must show that (1) she is a member of a protected class, (2) she was

qualified for the position, (3) she suffered an adverse employment action, and (4)

she was "either replaced by someone outside the protected class or treated different

than similarly situated, non protected employees." *Schaeffer v. Tractor Supply*

*Co.*, 2010 WL 2474085 (E.D. Mich. June 9, 2010) (citing *Noble v. Brinker Intern.,*

*Inc.*, 391 F.3d 715, 728 (6th Cir. 2004)).  To survive summary judgment on an

ELCRA gender discrimination claim, the same showing is required.  *Town v. Mich.*

*Bell Tel. Co.,* 568 N.W.2d 64, 68 (Mich. App. 1997).

For both claims, if the plaintiff successfully proves a prima facie case, the

burden of production shifts to the employer to articulate some legitimate,

nondiscriminatory reason for the employment decision.  *Ondricko v. MGM Grand*

*Detroit, LLC*, 689 F.3d 642 (6th Cir. 2012) (citing *Hazle v. Ford Motor Co.,* 628

N.W.2d 515, 521–22 (Mich. App. 2001)).  Once the employer carries this burden,

the burden of production shifts back to the plaintiff to show that the legitimate

reasons offered by the employer were not its true reasons, but pretext for unlawful

discrimination.  *Id.*

       1.    Prima Facie Case

Defendant concedes that Plaintiff can establish a prima facie case of

discrimination.  (ECF No. 20, PageID.210).

2.      Legitimate, Nondiscriminatory Reason

Defendant offers that it has a legitimate, nondiscriminatory reason for

Plaintiff's temporary layoff and separation: objective, documented data proving

she was one of the least productive in her department and that her separation was

part of a system-wide initiative where 2,500 employees were laid off.  (ECF No.

20, PageID.210).  For an employer to articulate a legitimate, nondiscriminatory

reason, the "burden is one of production, not persuasion."  *Wofford v. Middletown*

*Tube Works, Inc.*, 67 F. App'x 312 (6th Cir. 2003) (citing *St. Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 509 (1993)).

As for the productivity data, the layoff decisions were made by looking at

"how many hours [were] currently needed to run the department" and how each

department could be run efficiently.  (ECF No. 20-28, PageID.856-857).  Zeiter

evaluated Plaintiff and Johnson's "productivity, overall volumes, portable volume,

seniority," and found that Plaintiff was at the bottom of the list.  (*Id.*).  Zeiter's

decision to evaluate portable shifts in particular is similarly supported.  She

determined portable shifts were the "true assessment" of an employee's

"efficiency."  (ECF No. 20-29, PageID.1169-1170).

"Poor performance is a legitimate non-discriminatory reason for terminating

an employee" (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106,

1116 (6th Cir. 2001)); *see also Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d

791 (6th Cir. 2007) (where discharge of an employee who was "slower working, often taking more time to complete procedures which also led to the need for more operatories for patient-prep while he completed the previous consultation," was not discriminatory).  "[T]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." *Browning v. Dep't of Army*, 436 F.3d 692, 698 (6th Cir. 2006) (citation omitted).

The layoff decision also took place amid COVID-19 related mass layoffs throughout the hospital.  Burgett testified that the entire hospital was making layoffs during April 2020.  (ECF No. 20-28, PageID.852).  Many courts have established that furloughs, reductions in force ("RIF"), and layoffs because of the COVID-19 pandemic are verified legitimate, nondiscriminatory reasons. *Garvaglia v. George P. Johnson Project: Worldwide, Inc.*, 2023 WL 3826456, at *5 (E.D. Mich. June 5, 2023) (defendants entitled to summary judgment "on Plaintiff's age discrimination claim because Plaintiff was discharged as part of an economically motivated RIF necessitated by the COVID-19 pandemic and the Governor's 'stay home' orders without regard to his age"), *see, e.g., Mooney v. Roller Bearing Co. of Am., Inc.*, No. C20-01030-LK, 2022 WL 1014904, at *16 (W.D. Wash. Apr. 5, 2022) ("Mooney does not dispute that RBC determined that it needed to institute a RIF based on business realities, including the COVID-19 pandemic and its resulting impact on the business, or that RBC laid off numerous

16

other employees too. A reduction in force is a legitimate, non-discriminatory reason for termination . . . " (citation omitted)); *Berry v. Airxcel, Inc.*, No. 20-1362-KHV, 2022 WL 2952511, at *7 (D. Kan. July 26, 2022) ("Courts have recognized that an economic downturn in a given industry is a legitimate, non-discriminatory reason for a reduction in force and that a reduction in force is a legitimate, non-discriminatory reason for termination of an employee" (citation omitted)).

Because the layoffs occurred amid furloughs throughout the hospital, and Defendant can offer that the reason for the layoff was objective productivity data, Defendant has established a legitimate, nondiscriminatory reason for the decision.

### 3.    Pretext

Because defendant has met its burden, the presumption of discrimination established by the prima facie showing "simply drops out of the picture." *Hicks*, 509 U.S. at 511.  Plaintiff must now "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Cmty. Affs. v. Burdine*, 450 U.S., 248, 253 (1981).  "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 515; *See also Stockman*, 480 F.3d at 801-802.  "A plaintiff can refute the legitimate, nondiscriminatory

reason that an employer offers to justify an adverse employment action by showing that the proffered reason (A) has no basis in fact, (B) did not actually motivate the defendant's challenged conduct, or (C) was insufficient to warrant the challenged conduct." *Id.* (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)). Plaintiff cannot carry this burden.

Plaintiff argues the reasons offered by Defendant are mere pretext. She claims the layoffs were not based on any "uniform process or instructions from H.R." and that Zeiter "cherry-picked" data to conclude the only two pregnant employees needed to be laid off.[1] (ECF No. 22, PageID.1767-1770). And she argues Zeiter did not include several procedures in her productivity analysis, but focused on "portable" shifts which Zeiter herself had assigned. (*Id.* at PageID.1769). Bunnell claims she had a high number of shifts at the Women's Health Center and a low number of portable shifts, and therefore the data was selected "to make it appear that Plaintiff" was unproductive. (*Id.* at PageID.1770). Finally, in her deposition, Plaintiff states she suffered from severe morning sickness in December 2019, which impacted her productivity data. (ECF No. 23-2,

---

[1] Plaintiff claims she and Deni Johnson were both pregnant at the time of their layoff. But Zeiter testified that "Deni had suffered a miscarriage" and spoke with Zeiter about it, either "during her layoff discussion or . . . the Labor Pool discussion." (ECF No. 20-29, PageID.1217). Plaintiff also states Johnson "had had her miscarriage" at the time of her layoff, and "three out of the four employees who were selected for temporary layoff . . . were not pregnant at the time." (ECF No. 20-27, PageID.637).

PageID.1829).  With her morning sickness, she would have to step away from work, which would impact the time she spent working.  (*Id.*).

Though Plaintiff was pregnant, she cannot show that the productivity reasoning is not factual, could not warrant the lay-off, was affected by her pregnancy, or that pregnancy discrimination was the real reason behind the layoff. Plaintiff disagrees with the statistics used in Zeiter's productivity data, but she cannot argue that the data suggested she was not one of the least productive in her department.

First, Zeiter did not select data to make it appear that Plaintiff was unproductive.  Though Zeiter may have assigned portable shifts, she was not the sole decisionmaker in the layoff decisions.  Burgett and Zeiter had a "detailed conversation" about what was included in the analysis.  (ECF No. 20-28, PageID.926).  Burgett "a hundred percent agreed with" the decision to layoff two on the list as they were either previously on leave or had expressed intent to resign. (ECF No. 20-29, PageID.1136-1137).  They attempted to put "everybody on the same playing field" and calculated performance based on hours worked and "how many studies people did per hour worked."  (ECF No. 20-28, PageID.930-931). Zeiter particularly evaluated portable shifts because "[p]ortable volumes really . . . give a more true assessment to [employees'] efficiency because when you're a portable you have less barriers in your way."  (ECF No. 20-29, PageID.1140).

Though Plaintiff argues her number of portable shifts was affected by her work in the Women's Health Center, other ultrasonographers rotated between departments as well.  (ECF No. 20-27, PageID.445-447), (ECF No. 20-29, PageID.1047-1049).

"[W]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009); *see also Stockman*, 480 F.3d at 802 ("An employee's opinion that he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor."); *Majewski*, 274 F.3d at 1116-17 ("Disagreement with [defendant]'s honest business judgment regarding his work does not create sufficient evidence of pretext in the face of the substantial evidence that [defendant] had a reasonable basis to be dissatisfied.").

Also, membership in a protected class does not insulate an employee from layoffs based on productivity or performance.  *Hammond v. Sysco Corp.*, 2023 WL 8847365 (6th Cir. Dec. 21, 2023) ("Hammond was one of the unfortunate 160 [laid off employees] because . . . his supervisor . . . determined that he ranked the lowest among the company's revenue management directors.  Her ranking relied primarily on performance reviews, talent reviews, and leadership assessments."); *see also Danielson v. City of Lorain*, 938 F.2d 681. 684 (6th Cir. 1991) ("[w]orkers who

20

poorly perform their jobs will not be insulated from dismissal simply because they are members of [a] protected [ ] group.").

Plaintiff's assertion that Zeiter cherry-picked the data to support the decision is not based on record evidence.  It is Plaintiff's speculation.

Similarly, though Plaintiff argues her pregnancy made her less productive through December 2019, which would impact her productivity, she provides no evidence to prove this.  Both arguments are mere speculation and cannot be used to defeat summary judgment.

Plaintiff also cannot, and does not, dispute that the layoffs followed labor disruptions caused by the COVID-19 pandemic impacting the entire hospital rather than discriminatory animus.  She cannot dispute that the layoffs would have happened irrespective of her pregnancy.  (ECF No. 23-1, PageID.1802).  As a result, Plaintiff has no evidence to suggest her layoff was discriminatory.

The motion for summary judgment on the issue of sex and pregnancy discrimination under Title VII and ELCRA should be granted.

B.     Disability Discrimination under ADA and PWDCRA

To make out a prima facie case of discrimination under the ADA, a Plaintiff must show "(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and who was discriminated against because of the disability."

*Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (citation omitted).  Under PWDCRA, "a plaintiff must show that (1) he is 'disabled' as defined by the statue, (2) the disability is unrelated to the plaintiff's ability to perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute."  *Chiles v. Mach. Shop, Inc.*, 606 N.W. 2d 398 (Mich. App. 1999).

       i.    Disability

Defendant first argues Plaintiff cannot establish she was disabled.  (ECF No. 20, PageID.215).  Plaintiff herself acknowledges that "pregnancy – in and of itself – is not a disability."  (ECF No. 23, PageID.1783).  This concession is aligned with the unanimous holdings of the federal courts that have considered this issue.  *See, e.g.*, *Richards v. City of Topeka*, 173 F.3d 1247, 1250 (10th Cir.1999) ("[W]e do note that numerous district courts have concluded that a normal pregnancy without complications is not a disability under 42 U.S.C. § 12102(2)(A).") (listing cases); *Navarro–Pomares v. Pfizer Corp.*, 97 F. Supp. 2d 208, 212 (D.P.R. 2000) (observing that the only district judge to have held that pregnancy, by itself, was a disability under the ADA reversed himself in a subsequent case), *rev'd on other grounds*.  Also, the interpretive guideline for the term "disability" issued by the Equal Employment Opportunity Commission in its Compliance Manual excludes pregnancy from its definition of disability.  EEOCCM § 902.2(c)(3), 2009 WL

4782107 (Nov. 21, 2009) ("Because pregnancy is not the result of a physiological

disorder, it is not an impairment.").

Even so, Plaintiff argues that pregnancy-related conditions, including her

morning sickness caused here to be "very sick and" she was "throwing up a lot,

and . . . her doctor was concerned."  (ECF No. 23, PageID.1784).  Yet in her

deposition she states the doctor's note she had obtained on January 3, 2020 "wasn't

given . . . because of any specific issues regarding [her] pregnancy" and that her

requests were "just standard."  (ECF No. 23-1, PageID.1796).  She also

acknowledges the second note she obtained on February 24, 2020, was "a standard

accommodation . . . not typically something that you need a doctor's note for."

(*Id.*).

"Pregnancy-related conditions have typically been found to be impairments

where they are not part of a 'normal' pregnancy."  *Spees v. James Marine, Inc.*,

617 F.3d 380, 397 (6th Cir. 2010).  Temporary conditions brought on by pregnancy

in general are also not disabilities.  *See Muska v. AT&T Corp.*, No. 96C5952, WL

544407, at *9 (N.D. Ill. Aug. 25, 1998) (temporary fetal distress did not render

pregnant employee disabled); *Leahr v. Metro. Pier & Exposition Auth.*, No.

96C1388, 1997 WL 414104, at *2-3 (N.D. Ill. July 17, 1997) (holding that

plaintiff's pregnancy-related complications of high blood pressure and gall bladder

problems, which were only temporary, did not constitute a disability under the

ADA); *Kennebrew v. New York Hous. Auth.*, 2002 WL 265120, at *18 (S.D.N.Y. Feb. 26, 2002) (granting summary judgment on ADA claim relying on gestational diabetes because it was a short-term condition and was not substantial enough to constitute a disability for ADA purposes).

Most federal courts hold that pregnancy-related complications do not constitute a disability under the ADA, and as such, morning sickness, which is a temporary, normal part of pregnancy, does not constitute a disability. "In the few cases that have held that pregnancy-related complications constitute a disability, the plaintiffs' symptoms were significantly more serious," *Gorman v. Wells Mfg. Corp.* 209 F. Supp. 2d 970, 976 (S.D. Iowa, July 15, 2002) or rose to a "substantial complication," *Spees*, 617 F.3d 380, 397. *See also Szabla v. St. John Hosp. & Med. Ctr.*, 2011 WL 3714068 (E.D. Mich. Aug 24, 2011) (A pregnancy where there was "prior miscarriage; bleeding and lower abdomen groin pain that developed during her second successful pregnancy" was a disability). As Plaintiff herself acknowledges, the symptoms and accommodations she requested were standard, and the only pregnancy-related complication she suffered from was morning sickness. Plaintiff cannot establish she was disabled under the ADA or PWDCRA.

ii.     Failure to Accommodate

24

Even if Plaintiff were disabled under the ADA, she cannot establish her failure to accommodate claim.

For a failure to accommodate claim, Plaintiff must prove "(2) [s]he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about [her] disability; (4) [s]he requested an accommodation; and (5) the employer failed to provide the necessary accommodation . . . As part of this prima facie case, a plaintiff 'bears the initial burden of proposing an accommodation and showing that accommodation is objectively reasonable.'" *Hunt v. Monro Muffler Brake, Inc.*, 769 F. App'x 253, 258 (6th Cir. 2019) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) (internal citations omitted)).

A plaintiff bringing a failure to accommodate claim bears the initial burden of proposing or requesting an accommodation for his or her disability. *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014). Once that request is made, the employer's duty to engage in an "interactive process to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations" is triggered. *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84 (6th Cir. 2012). There is no bright line rule for when an employee's request for accommodation is "sufficiently clear to constitute a request for an accommodation." *Judge*, 592 F. App'x at 407. While

employees do not have to "use the magic words 'accommodation' or even 'disability,'" they do have to make clear that their request for accommodation is made on account of their disability. *Id.* Employers are not "not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Id.*

Plaintiff was qualified for the position, as she had been working in that position before her pregnancy. Plaintiff also informed Zeiter of her pregnancy on December 2, 2019, therefore notifying her employer of her alleged disability, and asked to be removed from shifts where she would be exposed to radiation. (ECF No. 23-2, PageID.1816). On February 26, 2020, she also gave Zeiter a doctor's note indicating her pregnancy and requested that her exposure to infectious diseases be minimized. (*Id.* at PageID.1817), (ECF No. 20-29, PageID.1052-1053). Therefore, her employer knew of her alleged disability, and she requested an accommodation to be kept from exposure to radiation and infectious diseases.

Plaintiff argues Zeiter reacted with anger when she requested her accommodation. (ECF No. 13, PageID.95). Despite the outburst, Zeiter told Plaintiff "there was no question that her accommodations would be met," and did provide the necessary accommodations. (ECF No. 20-29, PageID.1054). Plaintiff worked with Zeiter to be removed from the lab where she would be exposed to radiation, as in her first accommodation request. (ECF No. 23-1, PageID.1795).

Zeiter ensured she would not be on call to stay late in the lab because radiation exposure was possible. (*Id.*). Plaintiff herself admits there were no issues with this accommodation. (*Id.*).

Plaintiff's next accommodation request was to avoid exposure to infectious disease patients. (ECF No. 20-29, PageID.1052-1053). She wanted to avoid exposure to airborne illnesses like "tuberculosis, flu" and Covid. (ECF No. 23-2, PageID.1819).

Defendant accommodated this request. For a month following the February note, Plaintiff was not exposed to any infectious disease. (ECF No. 20-27, PageID.567). On March 23, the COVID-19 pandemic began. (*Id.* at PageID.568). Zeiter asked Plaintiff whether she felt comfortable coming to work because of the high number of COVID-19 patients. (*Id.* at PageID.572). Plaintiff was shifted to the labor pool on March 24, 2020. (*Id.* at PageID.575). Zeiter asked her about several shifts and whether she would be comfortable with them. (*Id.* at PageID.576-578). She was also given the option of taking a leave of absence or PTO if she did not feel comfortable.

Plaintiff was assigned to two shifts where she was near Covid positive patients and where she had to clean Covid floors. (*Id.* at PageID.579). She argues that this is evidence that Defendant failed to accommodate her. But Burgett acknowledged that "in a normal situation they would have had no problem

27

accommodating long-term, but once COVID-19 started, the number of patients in the hospital shifted to pretty much all of them having infectious diseases," leaving very few non-infectious patients in the hospital.  (ECF No. 20-28, PageID.827-828).

When considering an accommodation, employers consider "(1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee." *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998).  If an accommodation "frustrates attendance," an employer is not bound by the request. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805 (6th Cir. 2020).  Also, "[a]n employer's refusal to provide an accommodation to the position of the employee's choice immediately upon the employee's request is not, in and of itself, a failure to accommodate." *Brumley v. Utd. Parcel Servs., Inc.*, 909 F.3d 834, 840 (6th Cir. 2018).

After speaking with Zeiter, Zeiter assigned her shifts wherein she would not be exposing her to Covid.  (ECF No. 20-27 PageID.579-581).  Though some shifts she was offered involved potential exposure to Covid, given that the hospital was overwhelmed with Covid patients, it would be unreasonable to expect Zeiter to insulate Plaintiff from any Covid exposure.

iii.    FMLA Interference

Plaintiff argues she was given conflicting information from Defendant about FMLA leave, including being asked that she not take it, being told she would not qualify, having her hours reduced, and having the hours be used as an excuse to not grant leave.  (ECF No. 13, PageID.128).  She also claims that when the leave concluded, she was not allowed to return to work even though Defendant could have returned her to part-time contingent work.  (*Id.* at PageID.128).  She also states that Defendant hired another person in her place.  (*Id.*).

Defendant argues summary judgment should be granted because Plaintiff received her full 12-week FMLA leave, and she was restored exactly to her pre-FMLA status.  (ECF No. 20, PageID.216-17).  Plaintiff responds by saying she was not reinstated to a substantially equivalent job on her return from FMLA leave, and Defendant failed to inform her of a job opening on October 21, 2020, the day she was to return to work.  (ECF No. 23, PageID.1775).  She also claims other employees, including less productive employees, were brought back to work while she was on maternity leave.  (*Id.*).

To establish a claim for interference under the FMLA,

> an employee must establish that (1) she was an eligible employee as defined under the FMLA, (2) her employer was a covered employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take FMLA leave,

29

and (5) her employer denied FMLA benefits to which she
was entitled.

*Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572 (6th Cir. 2007).

Neither party disputes the first four prongs of this analysis. Plaintiff states

Defendant "[was] trying to help [her] get approved for the leave" and even

"backdated" her employment "to a date that [she] was eligible." (ECF No. 20-27,

PageID.669- 670).

Plaintiff was on furlough when she took FMLA leave. Plaintiff informed

Zeiter and Brancaleone that she would be cleared to return to work on October 21,

2020. (*Id.* at PageID.676-77). Zeiter responded to say "as far as the lab, we

continue to evaluate the volume and staffing needs on a weekly basis." (*Id.*). On

October 16, 2020, Plaintiff sent a note to Zeiter informing her she would be cleared

to return to work, to which Zeiter responded, "[u]nfortunately at this time due to

department volumes, we are unable to return you to work," and that she could

apply for other jobs in the system if she chose to. (*Id.* at PageID.678-81).

Plaintiff argues she should have been reinstated to the same position rather

than kept on furlough. In this Circuit, a court found that where a teacher was

terminated after her FMLA leave but all of the positions at her school were

eliminated, her dismissal did not violate the FMLA because "no violation occurs if

an employee is dismissed while on FMLA leave and the dismissal would have

occurred regardless of whether the employee exercised his or her rights under the

FMLA." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir.2003); *see also*
*Madry v. Gibraltar Nat'l Corp.*, 526 F. App'x 593, 596 (6th Cir. 2013) ("[a]n
employee returning from FMLA leave is not entitled to restoration unless he would
have continued to be employed if he had not taken FMLA leave.") (quoting *Grace
v. USCAR, LLC*, 521 F.3d 655, 669 (6th Cir. 2008)).

Other courts have taken a similar stance, particularly when employees were
on furlough because of the COVID-19 pandemic. *See Donnelly v. Cap. Vision
Servs., LLC*, 644 F. Supp. 3d 97 (E.D. Penn. December 6, 2022) ("since [she]
would have been furloughed whether she took FMLA leave or not, this argument
cannot salvage her interference claim"); *Monday v. La-Z-Boy, Inc.*, 2023 WL
6881066, at *13 (E.D. Tenn. Oct. 18, 2023) ("The evidence before the Court
demonstrates that, on the day Plaintiff Monday would have returned to work
following FMLA leave, the Dayton Plant was shut down with almost all its
employees laid-off due to the pandemic. Had Plaintiff not taken FMLA leave, she
nevertheless would have been laid-off.").

Plaintiff's circumstance is slightly different. Plaintiff was not reinstated
though others at her hospital were. While she was on leave, another employee was
brought back from furlough to continue working. Even so, the employee brought
back was not in the same role as Plaintiff. "[A]n 'equivalent position' is one that is
'virtually identical to the employee's former position in terms of pay, benefits, and

working conditions, including privileges, prerequisites and status. It must involve the same or substantially equivalent skill, effort, responsibility, and authority.'" (citing *Grace*, 521 F.3d at 669).  And the employee was brought back for the "congenital pediatric patients" which required "a P.E.D.s certification" and she was the only person in the department with that certification.  (ECF No. 20-28, PageID.859).  The role required a different skill – a certification only Johnson had – and was not equivalent to Plaintiff's original role.

The same applies for the Dearborn position.  Defendant did not have to tender the ultrasonographer position to Plaintiff or inform her of it, as it was in a different department, in a different location, and not substantially the same as her original position.

Finally, an employer is not precluded from terminating an employee who has requested or taken FMLA leave, so long as the employee's exercise of FMLA rights is not a factor in the employer's decision to act against the employee.  *See Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003) ("If the employee cannot show that he was discharged because he took leave – or at least that his taking of leave was a 'negative factor' in the employer's decision to discharge him – he cannot show a violation of the FMLA.").  As explained by Plaintiff, she was already on furlough before she began FMLA leave.  It is therefore not possible for the FMLA leave to affect her remaining on furlough

because she had been laid off before entering FMLA leave.  Pursuant to 29 U.S.C.

§ 2614(a)(3)(B), no employee is entitled to "any right, benefit, or position of

employment other than ... [that] to which the employee would have been entitled

had the employee not taken the leave."  Given that Plaintiff would have been on

furlough irrespective of the leave, she is not entitled to restoration.

The motion for summary judgment on the issue of FMLA interference

should be granted.

C.    Retaliation

Defendant argues Plaintiff's retaliation claims fail because she cannot

establish a causal connection between any protected activity and her layoff,

temporary removal from the labor pool, and termination.  (ECF No. 20,

PageID.181-182).  It states Plaintiff had not taken FMLA leave at the time she was

removed from the labor pool, and other employees who had engaged in any

protected activity were temporarily removed from the labor pool as well.  (*Id.* at

PageID.219).  It also claims all of her accommodations were granted, the layoffs

were objective and based on productivity data, and her employment ended as part

of a system wide initiative.  (*Id.* at PageID.219-220).

Plaintiff must demonstrate four elements to establish a prima facie claim of

retaliation: (1) she was engaged in a protected activity; (2) Defendant knew she

was engaged in the protected activity; (3) after learning of the exercise of protected

rights, Defendant took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2013) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (internal citations omitted); *see also El-Khalil v. Oakwood Healthcare, Inc.*, 934 N.W.2d 665 (Mich. App. 2019) (per curiam) (articulating the prima facie case under ELCRA)); *Hughes v. Henry Ford Health Sys.*, 2018 WL 3956362 (E.D. Mich. Aug 17, 2018) (stating the prima facie case requirement for ADA and PWDCRA).

If Plaintiff makes that showing, the burden shifts to Defendant to offer evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* And if Defendant succeeds, the burden shifts back to Plaintiff to show that Defendant's proffered reason is a pretext for unlawful discrimination. *Id.* To prove the proffered reason was pretext, Plaintiff must show that the proffered reason (1) has no basis in fact, (2) did not actually motivate Defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

i.   Causation

"'[T]o establish causation, the plaintiff must show that his participation in [the protected activity] was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett*

*v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. App. 2001). "A plaintiff must present evidence 'sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.'" *Walcott v. City of Cleveland,* 123 F. App'x 171, 178 (6th Cir.2005) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997)).

Temporal proximity can establish a causal connection for satisfying a prima facie case of retaliation. *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516 (6th Cir. 2008). Even so, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence. *Ngyuen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000) (citing *Parnell v. West* 114 F.3d 1188 (6th Cir. May 21, 1997) (where Plaintiff had not presented evidence of temporal proximity and Plaintiff was transferred as part of a reduction-in-force, causation was not shown for purposes of retaliation).

Plaintiff does not raise any evidence that Defendant's decision was caused by any protected activity. She claims Zeiter's failure to inform her of a new job opening in Dearborn and "catch her up" was an example of retaliation. (ECF No. 23, PageID.1776). But this is not the case. Not offering a new position is not an adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008) (an "adverse employment action" under Title VII is an action by the employer that constitutes a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").  Also, given Plaintiff's express desire to remain in Royal Oak, there is no reason for Defendant to inform Plaintiff of the job.  (ECF No. 20-27, PageID.681-682).

Nor are Defendant's actions after Plaintiff requested accommodations, admitted she was pregnant, or took FMLA leave retaliatory, as Plaintiff does not have evidence to show they amount to discriminatory actions, let alone that there was a causal link.  It has been clearly established that her temporary layoff was based on objective data and over reductions in force related to the COVID-19 pandemic.

### ii. Cat's Paw

Plaintiff later argues that Defendant has attempted to use Burgett and Brancaleone to shoulder Zeiter's discriminatory actions.  Under the "cat's paw theory" used to demonstrate discrimination in violation of Title VII, if a supervisor performs an act motivated by prohibited animus that is intended by the supervisor to cause the formal decisionmaker to take an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable.  *Coffman v. U.S. Steel Corp.*, 185 F. Supp. 3d 977 (E.D. Mich. 2016).

Cat's paw theory of liability applies "equally to FMLA retaliation claims as to other types of employment discrimination and retaliation claims . . . because in

'Title VII, the term "employer" includes not only any "person engaged in an industry affecting commerce" but "any agent of such a person."'" *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 378 (6th Cir. 2017) (*citing E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 485 (10th Cir. 2006) (quoting 42 U.S.C. § 2000e(b))).

Plaintiff claims Zeiter is using upper management employees such as Burgett and Brancaleone to hide her animus. Because Brancaleone and Burgett trusted her judgment as a manager, they asked no questions and made no investigations, taking Zeiter's word and allowing Zeiter to not extend the October 21, 2020 job opportunity to Plaintiff.

That said, Plaintiff does not have evidence to prove Zeiter was biased against her for any protected activity, nor does she have evidence to prove Zeiter was acting alone.

As stated above, Zeiter's decision to lay Plaintiff off was based on objective data. The decision was also made with input from, and discussion with, Burgett and Julie Huber. (ECF No. 20-28, PageID.858, 879). Burgett "a hundred percent agreed with" the decision to layoff two on the list as they were either previously on leave or had expressed intent to resign. (ECF No. 20-29, PageID.1136-1137). Zeiter only made the decision after she was "given a list of employees," who were predetermined (*Id.*). and was told to "take a look at the number [of layoffs] and . . .

[determine] that those were the right people to put on layoff." (ECF No. 20-28, PageID.853). Zeiter's productivity calculations were simply a confirmation of this evaluation.

Also, "HR was involved" in the decision. (ECF No. 20-27, PageID.623). Zeiter also followed procedure laid out by HR, which required department leadership to look at "what . . . they need to reduce or layoff depending on what the circumstances are." (*Id.* at PageID.625). Department leaders, "in conclusion with HR," make the layoff decisions. (*Id.* at PageID.624).

As for Zeiter's decision not to inform Plaintiff of the Dearborn job opening, Burgett herself testifies that instructions about the "TA process" were "very specific" and provided by HR. (ECF No. 23, PageID.1808). She states there was a corporate document that "talks [managers] through next steps, contact numbers, names, everything that we were supposed to be doing." (ECF No. 20-28, PageID.1009). Zeiter also refers to these rules and states the process for new jobs was to go through TA because "the talent acquisition team would have more than" what she could offer Plaintiff. (ECF No. 20-29, PageID.1281). Given the instructions for this employment were straight from a manual, it is impossible that Zeiter used any discriminatory animus in her actions.

There is no evidence of retaliatory motive, nor is there evidence of imputing retaliatory decisions to decisionmakers.  Therefore, the motion for summary judgment on the issue of retaliation should be granted.

E.     Intentional Infliction of Emotional Distress

Plaintiff claims she suffered intentional infliction of emotional distress. (ECF No. 13, PageID.132).  She bases this claim on the argument that Zeiter regularly yelled at her and humiliated her, told her Plaintiff's pregnancy would be an undue burden on the department, and Plaintiff was otherwise harassed and demeaned by supervisors.  (*Id.* at PageID.132-133).  She also argues Zeiter threatened her with layoffs and loss of income and that Zeiter intentionally subjected Plaintiff to extreme stress and anxiety after giving birth.  (*Id.*  at PageID.133-134).

Defendant argues this claim is baseless because the claim is preempted by the available remedies under the antidiscrimination statutes and the claim is "run of the mill" and does not constitute extreme and outrageous conduct sufficient to state a claim of intentional infliction of emotional distress.  (ECF No. 20, PageID.221). The undersigned agrees.

In order to establish a claim for intentional infliction of emotional distress ("IIED") under Michigan law, a plaintiff must demonstrate "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe

emotional distress." *Gibbs v. Voith Indus. Servs., Inc.*, 60 F.3d 780 (E.D. Mich.

2014).  "The test to determine whether a person's conduct was extreme and

outrageous is whether recitation of the facts of the case to an average member of

the community 'would arouse his resentment against the actor, and lead him to

exclaim, "Outrageous!"'" *Lewis v. LeGrow,* 670 N.W.2d 675, 689 (Mich. App.

Aug. 21, 2003) (citations omitted).

Plaintiff states "lower courts in this Circuit have concluded that [in] the sixth

circuit" it is not necessary that "IIED-based claims are preempted by the ADEA or

Title VII." (ECF No. 23, PageID.1785) (internal citations omitted).  Though this is

true, but it is only when allegations were of the magnitude that "[the defendants]

subjected Plaintiff to constant harassment, including threats to his life, threats to

his employment, threats of serious injury to him, harassing language and gestures,

and stalking" that preemption did not apply. *Powers v. U.S.*, 2018 WL 8345148, at

*9 (E.D. Mich. Sept. 10, 2018).  It is only "highly personal injury . . . such as rape,

sexual assault or stalking, defamation, and harassment with phone calls, resulting

in the Plaintiff suffering a miscarriage" which established "an exception to Title

VII's preclusive effect." *Id.*  A Plaintiff must meet the "highly personal" standard

to satisfy the exception to preemption. *Id.*  Such circumstances, must be more

than, "intense anxiety and fear of reprisal," bullying, intimidation, ridicule,

irrational anger, and fear for physical safety in order to fit "squarely into the

category of cases where IIED claims were found to be preempted by Title VII."
*Id.* Even situations where a Plaintiff was "subjected . . . to a pattern of
discrimination, verbal abuse, and a hostile work environment . . . [and] a
systematic regimen of abuse . . . so severe that she would either leave her job or be
unable to perform the job, leading to dismissal" do not meet this standard. *Id.*

Because "[n]one of [Plaintiff's] allegations involve alleged threats to her
life, a physical attack, or other highly personal injury" the intentional infliction of
emotional distress claim are preempted. *Id.* The record does not suggest a history
of harassment. Plaintiff's allegations that she was threatened with loss of income
or layoffs is also unsupported by the record. No actions rise to the level of severe
abuse or "highly personal" allegations. Plaintiff cannot offer any evidence that she
underwent a highly personal injury.

Plaintiff argues that her claims are far more than "run of the mill" claims and
warrant a finding of intentional infliction of emotional distress. Even so, there is a
high bar for intentional infliction of emotional distress claims in employment
cases. As stated in *Dickerson v. Nichols*, 409 N.W.2d 741, 743 (Mich. App. 1987),
"[t]he law intervenes only where the distress inflicted is so severe that no
reasonable person could be expected to endure it." Applied in an employment
setting, an employee must allege that the emotional distress was so severe that the
employee was forced to abandon employment and that no reasonable person in like

circumstances would have been able to endure the employment setting. *Postell-Russel v. Inmont Co.*, 691 F. Supp. 1 (E.D. Mich. 1988).

Plaintiff's claims do not meet this bar. She does not allege any outrageous facts. *See Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 777 (6th Cir.1996) (holding that a wrongful discharge, without more, does not provide an adequate basis for such a tort claim under Michigan law).

The motion for summary judgment on the issue of intentional infliction of emotional distress should be granted.

## IV.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment (ECF No. 20) be **GRANTED** and that the case be **DISMISSED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health*

*and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Loc. 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 8, 2024.                              s/Curtis Ivy, Jr.
                                                   Curtis Ivy, Jr.
                                                   United States Magistrate Judge